NO. 04-1478
(Judge Firestone)

---

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

---

CAPITOL INDEMNITY CORP.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**PLAINTIFF'S RESPONSE WITH APPENDIX IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

---

IRWIN KASS
Boardman, Suhr, Curry & Field LLP
One S. Pinckney Street, 4th Floor
Madison, WI 53703
Telephone: (608) 283-1762
Facsimile: (608) 283-1709

Attorney for Plaintiff

July 28, 2005

# TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF CONTENTS | i |
| TABLE OF AUTHORITIES | ii |
| PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS | 1 |
| PLAINTIFF'S BRIEF | 2 |
| QUESTIONS PRESENTED | 2 |
| STATEMENT OF FACTS | 2-5 |
| SUMMARY OF ARGUMENT | 6 |

Under equitable subrogation principles, by Plaintiff discharging R&T's debts to ensure project completion, the Complaint states a cause of action, even absent direct privity, because:

(1) The joint instructions to send all payments to Northern, by being in both bonds that were accepted by the V.A. without objection and before making any payments, became part of the Contract, expressly or impliedly, which made the V.A. a stakeholder, removing discretion to pay R&T, thereby making the V.A. liable for doing so irrespective of R&T's default and

(2) Alternatively, these instructions also represented the surety's requisite notice to the V.A. to send all payments to Northern in the event of R&T's actual or threatened default, which made the V.A. a stakeholder and, given that the V.A. was paying R&T while R&T was increasingly behind schedule and its work deemed "unsatisfactory", the V.A. abused its discretion under the Balboa test, thereby making the V.A. liable for paying directly under these circumstances.

| | |
|---|---|
| ARGUMENT | 6-13 |
| CONCLUSION | 14 |
| APPENDIX - INDEX TO APPENDIX | 15 |

# TABLE OF AUTHORITIES

## CASES


| Name | Page |
|---|---|
| American Ins. Co. v. United States<br>62 Fed. Cl. 151 (2004) | 12,13 |
| Balboa v. United States<br>775 F.2d 1158 (Fed. Cir. (1985)) | 8,11,13 |
| Insurance Company of the West v. United States<br>243 F.3d 1367 (Fed. Cir. 2001) | 12 |
| Insurance Company of the West v. United States<br>55 Fed. Cl. 529 (2003) | 6,9,10,11,12,13 |
| International Fidelity Insurance Company v. United States<br>41 Fed. Cl. 706 (1998) | 6,7,8,10,11,12 |
| Lamb Engineering & Construction Co. v. United States<br>58 Fed. Cl. 106 (2003) | 13 |
| Pearlman v. Reliance Ins. Co.<br>371 U.S. 132 (1962) | 12,13 |
| Transamerica Premier Insurance Company v. United States<br>32 Fed. Cl. 308 (1994) | 6,8,9,10,11,12 |


## STATUTES, RULES AND REGULATIONS


| | |
|---|---|
| 28 U.S.C. § 1491 (Tucker Act) | 5,7,10 |
| 31 U.S.C. §3727 (Assignment Act) | 4,10 |
| 40 U.S.C. §3131 (Miller Act) | 3 |
| 41 U.S.C. § 15 (Assignment Act) | 4,10 |
| RCFC 12(b)(4) Fed. R. Civ. P. 12 (b)(6) | 7 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CAPITOL INDEMNITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 04-1478** |
| | ) | **(Judge Firestone)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

The Motion to Dismiss must be denied because the Plaintiff surety would be entitled to relief on the Complaint, even absent direct privity, under equitable subrogation principles by discharging the contractor's debts to ensure project completion, in two respects:

(1) The joint payment instructions, by being on the bonds, became part of the Contract, expressly or impliedly, which made the Defendant a stakeholder, thereby removing any discretion to pay the contractor directly and

(2) Alternatively, these instructions were also the surety's requisite notice to the Defendant which would make the Defendant a stakeholder where paying the contractor directly was an abuse of discretion under the Balboa test.

**PLAINTIFF'S BRIEF**

QUESTIONS PRESENTED

(1) Whether the Plaintiff surety would be entitled to relief on the Complaint, even absent direct privity, under equitable subrogation principles by discharging the contractor's debts to ensure project completion in either or both of the following respects:

(A) The joint payment instructions, by being on the bonds, became part of the Contract, expressly or impliedly, which made the Defendant a stakeholder, thereby removing any discretion to pay the contractor directly?

(B) These instructions were also the surety's requisite notice to the Defendant which would make the Defendant a stakeholder where paying the contractor directly was an abuse of discretion under the Balboa test?

STATEMENT OF FACTS

It is undisputed that on or about September 26, 2002, Defendant, the United States Department of Veterans Affairs (V.A.) awarded a $579,257 Contract No. V69DC-506-8a (the Contract) to R&T Mechanical Contractors Inc. (R&T) to replace ARF chillers at the V.A. Medical Center, Milwaukee, WI. Compl. ¶ 4. ("Chillers" are air conditioning units.) R&T was required by the Contract to provide performance and payment surety bonds to guarantee that R&T would perform the Contract by completing its work and by paying its bills. The Plaintiff, Capitol Indemnity Corporation (CIC), was the surety which issued performance and payment bonds to the V.A. on R&T's behalf for these purposes.

These two bonds were issued on November 22, 2002 pursuant to the Miller Act, 40 U.S.C. § 3131 et seq. and signed "as Principal" by R&T by its President, Mr. Ricky Hunt and as "Surety" by CIC by its attorney-in-fact, Chris Johnson. Compl. ¶ 5 [Bonds-App. 1][1]

As a condition for CIC being surety, so as to minimize its risk in the event of R&T defaulting, R&T and CIC agreed that all Contract payments were to be sent by the V.A. to CIC's escrow agent, instead of directly to R&T. The plan was for the agent, Northern Escrow, Inc. ("Northern"), to receive the Contract payments from the V.A. and then administer and timely disburse the payments in accordance with the Contract. In this way, there would be no opportunity for R&T to misapply these funds. Also, this arrangement shifted the pressure to meet the payment demands of the subcontractors and suppliers from R&T to CIC, thereby allowing R&T to concentrate solely on performing the Contract while the bills were being paid by CIC through Northern in full and on time. This plan also benefited the V.A. by increasing the chances that the Contract would be on schedule. So, it was a "win-win" for everyone: CIC, R&T, R&T's subcontractors and suppliers, and the V.A.

To notify the V.A. of this agreement, both bonds were modified by R&T and CIC to contain the following payment instructions located on the front of each bond. Compl. ¶ 6:

**MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:**

**Note: All Contract funds relating to this project are to be sent to Northern Escrow, Inc. for distribution:**

**Northern Escrow, Inc.**
**1276 S. Robert Street**
**W. St. Paul, MN 55118**

---

[1] Signed copies were provided by Defendant's counsel. Attached to the Complaint as Ex. 2A and 2B were unsigned copies.

The V.A. received and accepted these bonds, as modified, without objection and before making any payments under the Contract. Compl. ¶ 7. So, before any payments were made, R&T and CIC believed that everything was in place for Northern to receive the funds. However, the V.A. disregarded these instructions and, instead, made the first three progress payments directly to R&T as follows, Compl. ¶ 9 Ex. 6:

| | | |
|---|---|---|
| 12/5/02 | - | $ 28,460 |
| 12/30/02 | - | $274,764 |
| 2/5/03 | - | $ 38,942 |
| TOTAL | | $342,166 |

Thereafter, the V.A. sent all remaining payments to Northern per the instructions, but only after R&T and CIC also executed an assignment under 31 U.S.C. § 3727, 41 U.S.C. § 15 at the insistence of the V.A. Contracting Officer, Mr. Scheuerell [Letters/Assignments-App. 2]. As these documents show, Mr. Scheuerell not only insisted on an assignment, but he rejected the first draft before accepting a second draft, which caused further delay in the payments being sent to Northern. These documents also show that these first three payments were made to R&T over Northern's strenuous objections.

Significantly, the V.A.'s records showed that while Mr. Scheuerell was running Northern through these drafting hoops, Mr. Scheuerell also ordered the first direct payment to R&T, even though R&T was already 19% behind schedule; then, per his orders, the second direct payment was made even though R&T was further behind schedule at 23%, and then, per his orders, the third payment was made even though R&T was even further behind schedule at 38% and its progress deemed by the V.A. to be "unsatisfactory". Compl. ¶ 8,9, Ex. 3-6.

As initially feared, R&T defaulted by not using these three direct payments to pay all of its subcontractors and suppliers, which was the consequence these joint instructions was designed to avoid; so, as a result, CIC had to pay a total of $113,556. Compl. ¶ 10, Ex. 7.

As shown on Ex. 7, the CIC payments were:

| | | | |
|---|---|---|---|
| 9/18/03 | - | $ 44,780 | to Johnson Controls |
| 9/30/03 | - | $ 8,673 | to Balestreri Environment |
| 1/5/04 | - | $ 55,853 | to Roman Electric |
| 1/19/04 | - | $ 4,250 | to First Supply Group |
| TOTAL | | $113,556 | |

These payments ensured R&T's performance, enabling it to continue working, because, as late as December 30, 2003, [V.A. Letter - App. 3.] R&T was still behind schedule. Consequently, R&T was able to continue to work through 2004 to finish the Contract. If R&T had to use its own funds to pay these claims, the project likely would not have been completed even by March 1, 2005. [V.A. Letter - App. 4.][2]

CIC sues the United States under the Tucker Act, 28 U.S.C. § 1491 to enforce its equitable subrogation rights as surety, claiming that CIC's loss of $113,556 was preventable in that it was due to the V.A.'s payment of $342,166 directly to R&T, which was contrary to the joint instructions to send all payments to CIC's escrow agent, Northern, and, moreover, was made while R&T was in actual or threatened default.

[2] R&T's president, Mr. Hunt, gave a deposition in the Bankruptcy Case, In Re: Ricky Hunt and Tria Hunt, Debtors Case No. 04-33165 (E.D. Wis.) where he testified that after Mr. Scheuerell told him it was "ok" to accept the funds in contradiction to the instructions, Mr. Hunt then used at least $50,000 from these first three payments for personal expenses such as back child support, back taxes, etc., and other amounts for general overhead instead of paying his subcontractors and suppliers. [Hunt depo. pp. 35-39, pp. 50-56, Ex. 20-App. 5]:

$ 7,000 - Back Child Support
$ 6,000 - Unemployment Tax Levy
$11,000 - Income Tax Levy
$28,000 - Income Tax Levy
$52,000 - TOTAL

## SUMMARY OF ARGUMENT

Under equitable subrogation principles, by Plaintiff discharging R&T's debts to ensure project completion, the Complaint states a cause of action, even absent direct privity, because:

(1) The joint instructions to send all payments to Northern, by being in both bonds that were accepted by the V.A. without objection and before making any payments, became part of the Contract, expressly or impliedly, which made the V.A. a stakeholder, removing discretion to pay R&T, thereby making the V.A. liable for doing so irrespective of R&T's default and

(2) Alternatively, these instructions also represented the surety's requisite notice to the V.A. to send all payments to Northern in the event of R&T's actual or threatened default, which made the V.A. a stakeholder and, given that the V.A. was paying R&T while R&T was increasingly behind schedule and its work deemed "unsatisfactory", the V.A. abused its discretion under the Balboa test, thereby making the V.A. liable for paying directly under these circumstances.

## ARGUMENT

Our Complaint states a cause of action based upon these three cases:[3]

International Fidelity Insurance Company v. United States ("IFIC") 41 Fed. Cl. 706 (1998) (held for surety on payment bond claim because government disregarded joint payment instructions); Transamerica Premier Insurance Company v. United States ("TPIC") 32 Fed. Cl. 308 (1994) (held for surety on payment bond claim because government disregarded joint payment instructions); and Insurance Company of the West v. United States ("ICW III") 55 Fed. Cl. 529 (2003) (held for surety on performance bond claim, which, however, included payments to subcontractors, notwithstanding there was neither a takeover agreement nor payment assignment, because government disregarded joint payment instructions).

---

[3] Curiously, none of these cases appear in Defendant's brief.

A. The Court in IFIC 41 Fed. Cl. 710,711 reviewed the law on this subject, summarized as follows:

(1) This Court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (1994) where a substantive right enforceable against the United States for money damages exists; the Act provides (in part):

> "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded upon . . . any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort" (citations omitted.)

(2) This Court must deny a motion to dismiss, unless it appears beyond doubt that Plaintiff can prove no set of facts entitling him to relief. RCFC 12(b)(4) "mirrors" Rule 12(b)(6) Fed. R. Civ. P. (citation omitted) (emphasis added).

(3) It is settled law that the Tucker Act, coupled with the doctrine of equitable subrogation, provides subject matter jurisdiction to the Court to determine a surety's claim against the government stemming from the alleged improper disbursement of contract funds (citation omitted).

The Court continued, IFIC 41 Fed. Cl. @ 712, summarized as follows:

(4) The terms of the bond are read into the Contract (citation omitted) (emphasis added).

(5) The surety was entitled to the benefit of all the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid (citations omitted) (emphasis added).

(6) The Court of Claims, by whose precedent we are bound, has long recognized the surety's right to subrogation in the security held by the government. The subrogation right is equitable, in origin and implementation, and is established when the surety

bonds are given (emphasis added) . . . . The duty devolves upon the government to administer the contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded (citation omitted) (emphasis added). . .

(7) A surety can establish a right of subrogation either of two ways: by completing the contract pursuant to its obligations under the performance bond or by paying off materialmen's claims brought under the payment bond (citations omitted) (emphasis added). N4 . . . materialmen are defined as subcontractors and suppliers on the contract (citations omitted).

The Court concluded in IFIC 41 Fed. Cl. @ 713-19, summarized as follows:

(8) Where it can be said that joint payment instructions become part of the contract, the government loses the discretion afforded by Balboa[4] and becomes a stakeholder on this basis alone, obligated to send all payments per the instructions and not to the contractor. To do otherwise is to be liable for overpayments.

(9) If these instructions are not part of the contract, then Balboa would apply, which is dependent upon such notice by the surety to the government not to pay the contractor, so as to make the government obligated as a stakeholder to the surety where there is abuse of discretion in paying the contractor directly (citations omitted).

B. The Court in TPIC 32 Fed. Cl. @ 312 stated these rules, summarized as follows:

(1) When paying off materialmen however, the surety is subrogated not only to the rights of the materialmen to retained contract funds, but also to the right of the government to use retained contract funds to pay materialmen, and the right of the contractor to these funds in

[4] Balboa Ins. Co. v. United States, 775 F.2d. 1158 (Fed. Cir. 1985) which identified eight factors to consider, where the joint payment instructions were not part of the contract, before finding the government liable for disregarding a surety's notice not to pay the contractor.

the event he has paid his materialmen (citations omitted). Hence a surety that has paid materialmen's claims can come directly against the government as the holder of retained contract funds.

and @ 313:

(2) As holder of the contract funds, suretyship law requires the government to use reasonable care in the custody and preservation of collateral in its possession (citations omitted) . . . and that obligation is triggered not only when the government is informed of the contractor's actual default but also - and perhaps more typically - when the government receives reasonable warning from the surety of a contractor's threatened default under the bond (emphasis added).

and @ 314:

(3) Quoting from a prior case (citation omitted), having paid out the funds due under the contract, the government contended that it was without liability in the matter. The argument was rejected (emphasis added). . . . If it is made to appear that the government's officials, after due notice of the facts giving rise to an equitable right in the plaintiff surety company, and of the plaintiff's assertion of such a right, paid out, without a valid reason for so doing, the money in question to someone other than the plaintiff, the plaintiff will be entitled to a judgment (citations omitted).

C. And the court in ICW III 55 Fed. Cl. @ 541 stated these rules, summarized as follows:

(1) After a Miller Act surety satisfies the subcontractor's claims, it "stands in the shoes" of the contractor; (emphasis added) and

(2) Once these subcontractors are paid, the surety's rights of subrogation relate back to the date of the execution of the bonds (citations omitted) (emphasis added). Significantly, these three cases did not require the surety, in order to protect itself, to first enter into a formal payment assignment under 31 U.S.C. § 3727, 41 U.S.C. § 15 so as to establish direct privity. ICW III 55 Fed. Cl. @ 531 N1 (lack of assignment has no bearing on outcome).

Given CIC discharged R&T's debts to ensure project completion, the above principles mandate stakeholder liability, even absent direct privity, because:

(1) When the V.A. accepted, without objection, the modified bonds dated November 22, 2002 [App. 1], the joint instructions to send all payments to Northern became part of the V.A.'s Contract with R&T, expressly or impliedly, thereby invoking relief under the Tucker Act based on an "express or implied contract". 28 U.S.C. §1491 (1994). IFIC 41 Fed. Cl. @ 712 (terms of the bonds are read into the contract). When accepting these bonds, the V.A. had no discretion but to follow these instructions, irrespective of any actual or threatened default by R&T and notwithstanding the lack of assignment or takeover agreement. IFIC 41 Fed. Cl. @ 714-719, ICW III 55 Fed. Cl. @ 531 N. 1, 542, TPIC 32 Fed. Cl. @ 315 N. 6. So, as a subrogation remedy, CIC can receive an amount equal to the payments that should have been made to CIC's agent, Northern, to the extent R&T's debts were discharged by CIC.

(2) Alternatively, these instructions were also the surety's continuing prior requisite notice to the V.A., that, upon R&T's actual or threatened default, all payments were to then be made to Northern. CIC should not have had to do anything more in order to trigger the V.A.'s stakeholder obligation, ICW III 55 Fed. Cl. @ 531, 539. In that case, the government was deemed a stakeholder as of the date it first received payment instructions from the surety even though 70 days had passed afterwards until the first payment. So, in our case, when, only 13

days later, on December 5, 2002, the V.A. determined that R&T was already 19% behind schedule, Compl. ¶ 8A, Ex. 3, Ex. 6, the V.A., as a stakeholder, based upon this timely prior notice, was obligated to send this first progress payment of $28,460 to Northern. This same analysis applies 38 days after CIC's notice to the 2nd progress payment dated December 30, 2002 of $274,764, when the V.A. records showed R&T's progress worsening to 23% behind schedule, Compl. ¶ 8 B. Ex. 4, Ex. 6, and 35 days thereafter to the 3rd progress payment of $38,942, when the V.A. records showed R&T's progress worsening further to 39% behind schedule and its work deemed "unsatisfactory", Compl. ¶ 8 C, Ex,. 5, Ex. 6 (in ICW III, the Court had no problem with payments made 70, 160, and 210 days respectively after notice, 55 Fed. Cl. @ 531). Thus, the V.A. abused its discretion and, as a subrogation remedy, would be liable to pay CIC as if the V.A. was paying under the Contract to the extent R&T's debts were discharged by CIC. Id. 55 Fed. Cl. @ 542, Balboa, 775 F.2d @ 1164-65.

On either basis, CIC's equitable subrogation rights were perfected upon discharging R&T's debts to its materialmen, totaling $113,556. As perfected, these rights "relate back" to November 22, 2002, the date of the bonds. ICW III 55 Fed. Cl. @ 541. The significance of this factor is that all conduct by the V.A. beginning that date is actionable. So, from "day one" as a stakeholder, the V.A. was entrusted with the obligation not to do anything to impair CIC's interest in these funds as security or increase the risk assumed by CIC when giving its bonds. IFIC 41 Fed. Cl. @ 712,. TPIC 32 Fed. Cl. @ 313. CIC rightfully assumed that its risk was reduced by having all payments sent to Northern [App. 1]. Mr. Scheuerell's actions materially and wrongfully increased this risk. Further, all of the payments made to R&T, totaling $342,166, represent the V.A.'s exposure, which is more than adequate to satisfy CIC's loss. In effect, under the "relate back" rule, the V.A. cannot claim now that since it paid out all the contract funds, the

surety is "out of luck". IFIC 41 Fed. Cl. 706 (1998), TPIC 32 Fed. Cl. 308 (1994) and ICW III 55 Fed. Cl. 529 (2003).

The Defendant's Motion relies primarily on two cases, Insurance Company of the West v. United States, 243 F.3d 1367 (Fed. Cir. 2001) (referred to as "West II" in ICW III 55 Fed. Cl. 529 (2003)) and American Ins. Co. v. United States ("AIC"), 62 Fed. Cl. 151 (2004). Neither support dismissal, notwithstanding the former is from a higher court and the latter is a recent decision from this Court, because they do not hold that equitable subrogation depends upon direct privity between the surety and the government.

West II was analyzed by this Court in ICW III, 55 Fed. Cl. beginning @ 534. In doing so, on pp. 536-7, this Court reaffirmed the "Pearlman Rule", Pearlman v. Reliance Ins. Co. 371 U.S. 132, 139 (1962), which held that the surety equitably subrogates to the contractor's rights, whether the surety suffers a loss under either the payment or performance bond and even absent direct privity. Then on p. 538, this Court explained away the West II dicta, which suggests that a payment bond surety's remedy is restricted, as asserted by the Defendant in our case, stating:

> "If a surety were limited to exercising the rights of only the subcontractors under the doctrine of equitable subrogation, the surety never would be able to recover directly from the contracting agency. Such a result would contradict a century of jurisprudence on equitable subrogation (emphasis added).

ICW III, 55 Fed. Cl. 529 should be controlling also because our facts are very similar. 55 Fed. Cl. @ 531, 543. In that case, like ours, there was no direct privity from a takeover agreement or an assignment, there were joint payment instructions, and the surety paid the materialmen while the project was still in progress, enabling the contractor to complete the work by discharging its debts. In our case, CIC paid these debts in late 2003 and early 2004 so R&T, who was still working on the project, could finish the job without having to deal with these creditors and eventually complete the job by March 1, 2005. Compl. ¶ 10, Ex. 7 [App. 3, 4].

The only difference is that the ICW III surety used its performance bond while CIC used its payment bond. Defendant would argue that CIC is somehow not deserving of relief simply because it chose one bond over the other to secure project completion. However, such a result would be splitting hairs, contrary to the spirit of the "Pearlman Rule".

AIC 62 Fed. Cl. 151 (2004) is distinguished because, in that case, the surety took no steps to protect itself before the government paid the contractor. This is in stark contrast to our facts, where before work started and any payments made, CIC and R&T jointly instructed the V.A., on the face of both bonds, to make all payments to Northern [App. 1].

The only explanation for the V.A.'s disregard of these instructions is arrogance as manifested by Mr. Scheuerell's erroneous insistence on an assignment [App. 2]. ICW III 55 Fed. Cl. @ 531, N.1. Yet, even his obstinance would have been tempered if he had, at the same time, exercised the government's right to pay the subcontractors and suppliers directly until a final assignment was to his liking. Lamb Engineering & Construction Co. v. United States 58 Fed. Cl. 106 (2003), which recognized and encouraged use of this right based on Pearlman, supra. Thus, his choice to pay over $340,000 directly to R&T, representing 60% of the Contract, pending an assignment, while R&T was not paying its bills and was falling further and further behind schedule, was the wrong one, being a defenseless abuse of discretion and in reckless disregard of the surety's rights. Balboa 775 F.2d @ 1164-65.

This flippant attitude towards sureties carries over to the Defendant's brief by the comment on p. 10 that the V.A. is not the surety's "nanny". CIC never asked the V.A. for protection; CIC asked only that the V.A. not thwart CIC's steps to protect itself. Accordingly, the V.A.'s plea for relief now is unsympathetic and should be rejected by this Court.

CONCLUSION

Under equitable subrogation principles, by CIC discharging R&T's debts to ensure project completion, the Complaint states a cause of action because the Defendant could be liable as a stakeholder for two reasons: the bonds' joint payment instructions became part of the Contract and, alternatively, these instructions were prior notice sufficient to invoke the Balboa test. Moreover, equitable subrogation does not depend upon direct privity.

Respectfully submitted,

/s Irwin Kass
Boardman, Suhr, Curry & Field LLP
One S. Pinckney Street, 4th Floor
Madison, WI 53703
Telephone: (608) 283-1762
Facsimile: (608) 283-1709

Attorney for Plaintiff

July 28, 2005

# **APPENDIX**

INDEX TO APPENDIX


| | ITEM | PAGE |
|---|---|---|
| 1. | Payment and Performance Bonds with joint payment instructions .................... | 1 |
| 2. | Assignment Letters and Documents ...................................................... | 8 |
| 3. | December 30, 2003 V.A. "lack of progress" letter ...................................... | 23 |
| 4. | March 1, 2005 V.A. "completion" letter .................................................. | 27 |
| 5. | Deposition of Ricky Hunt pp. 35-39; 50-56; Ex. 20 .................................... | 28 |

CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on this 29th day of July, 2005, a copy of PLAINTIFF'S RESPONSE WITH APPENDIX IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS was electronically filed. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s Irwin Kass
Boardman, Suhr, Curry & Field LLP
One S. Pinckney Street, 4th Floor
Madison, WI 53703

F:\DOCS\wd\27792\3\A0373478.DOC