UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WISCONSIN

---

IN RE:

RICKY HUNT, and
TRIA L. HUNT,

Debtor(s).

Case No. 04-33165-MDM

Chapter 13

---

Deposition of RICKY HUNT, SR.

Thursday, November 11, 2004

9:11 a.m.

at

Law Office of Richard A. Check, S.C.
757 North Water Street
Milwaukee, Wisconsin

Reported by Mary Lorentz, RPR

R&T Mechanical and not to Northern Escrow, correct?
A Yes. That's right.
Q And they were received by Lorraine Taylor?
A Yes.
Q Now, after your company received this first payment of 28,000 and change, did you speak up and contact Mr. Baldwin or Mr. Scheuerell about this mistake?
A I took this assignment into Tom Scheuerell's office. He was not able to agree or sign any documentation that would allow this to happen until they contacted their attorneys to make certain that this would be -- wouldn't be anything that would cause litigation. After it was determined that it wouldn't cause a problem, then he assigned the payments over to Northern Escrow.
Q Well, when you received this first payment, you knew about the condition of the bond, that all payments go to Northern Escrow?
A Yes.
Q Why didn't you just send that first payment to Northern Escrow?
A At that particular time, we started having bills coming in for that project for equipment, for payroll and other items that we had to go ahead and take care of before sending any funds to Northern Escrow.

Q But you knew that that was not the arrangement from day one, that Northern Escrow was supposed to get the payments first, and they would pay the bills?
A Yes.
Q Now, these same set of questions apply to the second payment of 275,000 and the third payment of 39,000. The bottom line is you knew that Northern Escrow was supposed to get the money, but you took it upon yourself to pay the bills with those first three payments, correct?
A Yes. That's right.
Q Rather than send the money to Northern Escrow and have them do it, correct?
A Yes.
Q Did you contact Northern Escrow and say, Hey, we're receiving this money. What do you want to do with it?
A I didn't, no. That -- that dialogue would have been between Lorraine and whoever the lady was at Northern Escrow.
Q But you don't know for a fact if Lorraine ever contacted Northern Escrow, do you?
A No, I don't.
Q And if you told you Northern Escrow did not know about this at all until after the third payment was

received and spent, would you have any information to contradict that?
A Repeat that question again.
(Question read.)
BY MR. KASS:
Q I'll put it to you this way, rephrase it.
A Okay.
Q If Northern Escrow told you that we didn't know about any of this until after the third payment was made to you and already spent, would you say that they were not telling the truth?
A No.
Q So based on what you know and looking backwards, can you reasonably say that northern escrow did not know about this until after the third payment was received and spent by R&T Mechanical?
A I believe -- I believe so. I was under the impression from the onset that Northern Escrow was aware that they -- they were not going to receive payments until after the lawyers were contacted.
Q But you never contacted Northern Escrow --
A I never contacted Northern Escrow, no.
Q -- and told them that you received these three payments, did you?
A No. No, I did not.

Q And you never instructed Lorraine Taylor to contact Northern Escrow, did you?
A No.
Q Okay. Now, looking at this first progress payment, Exhibit 11, if you could flip to the second page, do you see where it says Scheduled Percent Completion on the upper left-hand corner in the first column -- above the -- it's above the first column. See it says Scheduled Percent Completion?
A Yes.
Q And what's the number there?
A That number is 24 percent.
Q And underneath, what is it put down for Actual Percent Completion?
A 5 percent.
Q And who filled out this progress report?
A We fill the progress report out and send it over to Frank Baldwin. Frank goes out and he looks at the project and he determines if, in fact, 24 percent of the project was complete. If not, then he determines what percentage has been completed and then issues payment after that.
Q And so he's the one that put these percentages in, right? You didn't put these percentages in?
A The -- we put in the 24 percent on how much we

thought we should receive off of this first payment. Frank Baldwin went out to the site and says, No, we're not going to pay you 24 percent. I believe you've only completed 5 percent of the project.
Q So he put in the bottom number?
A Yes.
Q So he determined that even though you felt you were 24 percent complete, he determined, in fact, you were only 5 percent complete, correct?
A Yes.
Q If you could please go on -- and he -- excuse me.
He signed -- that's his signature on the third page of that document?
A Yes, it is.
Q Okay. If you could please go on to the next progress payment and flip it to the second page again in the same area we've been talking about. On that one you put down that you thought you were 35 percent complete --
A And he --
Q -- and he put down that you were only 12 percent complete, right?
A Yes.
Q If you could go on to the third payment?
A All right.

A That's the correct address, yes.
Q Now, this letter, it's from Northern Escrow asking you to account for these first three payments, right?
A Yes.
Q Okay.
A In order to accurately recreate accounting for the first three payments received by R&T Mechanical.
Q Because during the time you were receiving these payments, no one ever gave this information to Northern Escrow, correct?
A That's right. Yes.
Q Today can you account for these first three payments? Can you tell us where the $342,000 was spent?
A I can give you a ---an idea of where it was spent. I can give you an idea.
Q Can you tell me? Do you have a work sheet that we can mark as an exhibit that would --
A I don't think this would be sufficient to mark as an exhibit unless you want to take it as is as I've got recorded here.
Q Yes, I would, but if you could through it and please tell us.
A Okay. We have a mobilization cost of $20,000. Mobilization means that we prepare the site. We will walk through the site. We do a survey of the site.

We determine where we're going to locate equipment, where we're going to put a trailer. We made the determination of taking a fence down and putting up a temporary fence. All of these with getting our equipment on-site would cost -- is the cost for this mobilization of $20,000.

The payroll liability that I had on this site was -- as I went back through the paperwork, was approximately $85,000, somewhere along the line, and with all of the liability that goes along with paying our people.

We had a lien put on our account for unemployment insurance from the State of Wisconsin in the amount of $6,000.

The Trane equipment that was purchased was at a amount of -- I think initially it was 231,000, but after negotiating some, we got it to 154,000.

In order to stay out of jail, Milwaukee County Child Support Division wanted me to pay them or garnish $7,000.

Now, I have listed here $16,000 as a bond payment because I wasn't sure of the actual number.

We had a tax levy against our account for $11,000. Another levy that was against our account for $28,000.

The insurance to insure this project as far as liability was concerned, workmen's compensation and those types of things, was around 15 -- 12 to $15,000.

Overhead and other expenses for rental of the business property between the times that we discuss is 20 to $25,000. And those are the numbers that I have.

Q Did you ever add those up to see what they come to?

MR. CHECK: I can do it.

MR. KASS: Yeah. We'd like to mark that as an exhibit.

MR. CHECK: Does that include the thing that says Navy right down here?

THE WITNESS: No.

MR. CHECK: So just the things that are circled?

THE WITNESS: Yes.

MR. CHECK: Including tax lien?

THE WITNESS: Yes.

MR. CHECK: Adds up to 361,200.

MR. KASS: Do you want to make, please, a copy of that?

MR. CHECK: Sure.

(Short break taken.)

(Deposition Exhibit Numbers 17 THROUGH 20 marked for identification.)

MR. KASS: We can go back on the record.

BY MR. KASS:

Q We've just been talking about Exhibit Number 20, which is a work sheet prepared by Mr. Hunt trying to explain where the $342,000 went.

This $85,000 figure, is that money -- for payroll, is that payroll during the first two months of the job or payroll over the whole job?

A That would have been payroll over the whole job that we set aside to make certain we cover payroll. That's the reason why our initial requests were high. Those are moneys that we set aside so that we could take care of the payroll without having any problems. If you -- of course, if you don't pay your people, they're not going to work for you. We had that problem before. So what we started doing was asking contractors to pay us a larger amount in the onset so we wouldn't run into this cash flow problem.

Q So this 85,000 was projected over the whole contract, correct?

A Yes.

Q Now, you mentioned -- I'm looking at the $7,000 to Milwaukee County, and that was for back child

support?
A Yes.
Q And the $11,000 and $28,000 tax liens, if you add those three up, that's about $47,000. Did you -- those three amounts have nothing to do with this job?
A Once the moneys were deposited into our accounts, which, of course, we did, they -- if there's a tax levy, they go right into the account and take those moneys that we deposit into the account whether it has to do anything with this job or any job. If the money's out there, and they put a levy on it per what their documents say, then they take the money out.
So -- I mean, in some cases when that would take place, it would throw us off with -- as far as taking care of the total job itself. So in some instances, you would look at numbers and it would appear as we took money and put it somewhere else, where, in fact, it would be money that was taken from us, and we would have to try to make the funds up somewhere or another.
Q Again, the 7,000, the 28,000 and the 11,000 --
A Um-hum.
Q -- it's obvious, the answer to the question is they were not used to pay subcontractors or suppliers or laborers on the job, right?

A They were not.
Q And did you ask for permission from Northern Escrow or Capitol Indemnity Corporation to take about $47,000 out of the contract and use it to pay these three items?
A How could I ask permission for it if they go into the bank and take it themselves?
Q Did you -- okay. So you never asked permission, correct?
A No.
Q Did you ever tell Capitol Indemnity or Northern Escrow as to where this $47,000 went?
A No, I didn't.
Q And so you didn't have their permission to use this $47,000 in the way you did, did you?
A No.
Q Okay.
A Nor could I control it.
Q Unless you would have sent the money directly to Northern Escrow as you originally agreed to do in the beginning?
A Yes.
Q And then the money would never have been in your account, and they would have paid off -- use the 47,000 to pay your subs and suppliers instead of it

being taken by the tax authorities or Milwaukee County, right?

A They eventually sent it to us and ended up in the account anyway, and it would have been taken.

Q Well, you don't know that. Well, I don't --

Now, the insurance of 15,000, was that the insurance over the entire contract or for your annual premium or how does that break down?

A This would have been from when the contract started up to when it ended.

Q So that's the whole life of the contract, right?

A Yes.

Q Now, you allocated $16,000 for the bond, but according to Lorraine Taylor's breakdown, which you said was accurate, there was only $9,000 for the bond.

A I assume that this was accurate. I don't know if we can do the percentage on it?

Q Well, your work sheet on Exhibit 20 said you set aside 16,000 for the bond, but the actual cost of the bond on this job was only 9,000 correct?

A If we can add it up, I'll be able to determine if this 9,000 or 16,000 is correct.

MR. CHECK: What do you want me to add?

THE WITNESS: The total amount of the

RENTAL BUSINESS - 08/02 - 04/03
$25,000.00

- New -
Address
< & Project >

TAX LIEN $28,000.00
TAX LIEN $11,000.00 >

BOND $16,000.00 >

INSURANCE $15,000.00 >

MILW. COUNTY $7,000.00

< VALUE OF EACH 02 — 03

MOBILIZATION $20,000.00

New
Comp
Number
Year

TRANE EQUIPMENT $154,200.00

PAYROLL $85,000.00

UNEMPLOYMENT $6,000.00

< NAVY $25,600 >

R. Hunt
EXHIBIT 20
11/11/04 ML
GRAMANN REPORTING, LTD.

STATE OF WISCONSIN )
) ss:
MILWAUKEE COUNTY )

I, Mary Lorentz, a Registered Professional Reporter and Notary Public in and for the State of Wisconsin, do hereby certify that the preceding deposition was recorded by me and reduced to writing under my personal direction.

I further certify that said deposition was taken at 757 North Water Street, Milwaukee, Wisconsin, on the 11th day of November, 2004, commencing at 9:11 a.m. and concluding at 11:05 a.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof, I have hereunto set my hand and affixed my seal of office on this 23rd day of November, 2004.

Mary Lorentz

NOTARY PUBLIC
MARY LORENTZ
STATE OF WISCONSIN

Mary Lorentz, RPR - Notary Public

My Commission expires February 17, 2008.

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on this 29th day of July, 2005, a copy of PLAINTIFF'S RESPONSE WITH APPENDIX IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS was electronically filed. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s Irwin Kass
Boardman, Suhr, Curry & Field LLP
One S. Pinckney Street, 4th Floor
Madison, WI 53703

F:\DOCS\wd\27792\3\A0366976.DOC