**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**Case No. 04-1478**
**(Judge Firestone)**

---

**CAPITOL INDEMNITY CORPORATION,**

**Plaintiff,**

**v.**

**THE UNITED STATES**

**Defendant.**

---

# Brief of Amicus Curiae The Surety Association of America

---

Edward G. Gallagher
Wickwire Gavin, P.C.
8100 Boone Boulevard, 7th Floor
Vienna, VA 22182
Tel: (703) 790-8750
Fax: (703) 448-1801

Attorney of Record for
The Surety Association of America

# Table of Contents

**Statement of Interest** .......... 1

**Statement of Facts** .......... 1

**Statement of the Case** .......... 2

**Argument** .......... 2

**I. *Blue Fox* is Consistent with Tucker Act Jurisdiction for Suit by a Payment Bond Surety** .......... 4

**II. The Insurance Company of the West Decisions Are Consistent With Tucker Act Jurisdiction Over Suits by a Payment Bond Surety** .......... 5

**III. A Payment Bond Surety Can Enforce the Superior Equities of the Subcontractors It Paid** .......... 10

**IV. Logic and Public Policy Support Rejection of the Government's Arguments.** .......... 12

**V. This Court Has Tucker Act Jurisdiction Over a Payment Bond Surety's Suit** .......... 14

**Conclusion** .......... 14

# Table of Authorities

## Cases

*Active Fire Sprinkler Corp. v. United States Postal Service*, 811 F.2d 747 (2nd Cir. 1987)......... 11

*Argonaut Insurance Co. v. United States*, 193 Ct. Cl. 483, 434 F.2d 1362 (1970) ........................ 4

*Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed. Cir. 1985) .......................... 3, 6, 7, 8

*Dept. of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 119 S.Ct. 687, 142 L. Ed. 2d 718 (1999) ........................................................................................................... 4, 5, 6, 10

*Fireman's Fund Insurance Co. v. United States*, 190 Ct.Cl. 804, 421 F.2d 706 (1970) ................ 4

*Great American Insurance Co. v. United States*, 203 Ct.Cl. 592, 492 F.2d 821 (1974) ................ 4

*Hartford Fire Insurance Co. v. United States*, 40 Fed. Cl. 520 (1998) ......................................... 4

*Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908) ............................................................................................. 10

*Home Indemnity Co. v. United States*, 180 Ct. Cl. 173, 376 F.2d 890 (1967)............................... 4

*Insurance Company of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001) ............. passim

*Insurance Company of the West v. United States*, 55 Fed. Cl. 529, 534-538 (2003) ..................... 9

*Integon Indemnity Corp. v. United States*, 12 Cl.Ct. 115 (1987)................................................... 4

*International Fidelity Insurance Co. v. United States*, 25 Cl. Ct. 469 (1992)............................... 4

*International Fidelity Insurance Company v. United States*, 41 Fed.Cl. 706, 711 (1998)............ 3

*Kennedy Electric Co. Inc. v. United States Postal Service*, 508 F.2d 954 (10th Cir. 1974).......... 11

*Lamb Engineering & Construction Co. v. United States*, 58 Fed. Cl. 106 (2003) ................ 11, 12

*North Denver Bank v. United States*, 193 Ct. Cl. 225, 432 F.2d 466 (1970) .............................. 12

*Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962).... passim

*Reliance Insurance Co. v. United States*, 15 Cl.Ct. 62 (1988) ...................................................... 4

*United Electric Corp. v. United States*, 227 Ct.Cl. 236, 647 F.2d 1082 (1981) ..................... 3, 5, 9

*United Pacific Insurance Co. v. United States*, 16 Cl. Ct. 555 (1989) .......................................... 4

*United States Fidelity & Guaranty Co. v. United States*, 16 Cl.Ct. 541 (1989) ............................ 4

*United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973) ........................................................................................................................ passim

*United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949) .................................................................................................................................. 6

*United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947) .... 8, 9, 10

*Wright v. United States Postal Service*, 29 F.3d 1426 (9th Cir. 1994) ......................................... 11

**Statutes**

Administrative Procedures Act ("APA"), at 5 U.S.C. §702 ......................................................... 4

FAR §52.232-5 (48 C.F.R. §52.232-5)........................................................................................ 11

Miller Act, 40 U.S.C. §§3131, et seq. ............................................................................................ 1

Prompt Payment Act, 31 U.S.C. §3903(b)(1)(B)......................................................................... 11

Tucker Act, 28 U.S.C. §1491........................................................................................ 1, 2, 5, 14

## Statement of Interest

The Surety Association of America ("SAA") is a voluntary, non-profit trade association with approximately 500 member companies. Collectively, these companies write the overwhelming majority of the performance and payment bonds required by the Miller Act, 40 U.S.C. §§3131, et seq., for public works projects of the United States. SAA collects statistics on premiums and losses for fidelity and surety insurance and files those statistics with the insurance departments of all 50 states.

Like other insurance products, the cost of surety bonds ultimately depends on the losses sureties incur. If sureties cannot assure that contract funds are used to pay contract obligations, losses, and hence the cost of bonds, will increase. The United States argues that the Tucker Act, 28 U.S.C. §1491, does not grant this Court jurisdiction over a suit by a payment bond surety to recover judgment for contract funds held, or wrongfully disbursed, by the United States. If correct, this argument would change well-established law upon which sureties have relied in providing Miller Act bonds and in computing premiums for such bonds.

The outcome of this case will have a significant impact on Miller Act sureties, and in the long term on the availability and cost of bonds on federal construction projects. SAA and its members who are not parties to this case have a significant interest in the Court's decision on the jurisdictional question raised in the Government's Motion to Dismiss.

## Statement of Facts

For purposes of this Brief responding to defendant's Motion to Dismiss the Complaint, the facts are apparently not in dispute. As surety for R&T Mechanical Contractors, Inc. ("R&T") on Veterans Administration ("VA") Contract No. V69DC-506-8a, plaintiff Capitol Indemnity Corporation ("CIC") paid $113,665 to subcontractors and suppliers whom R&T failed to pay.

CIC did not takeover the contract work and, according to the Government, did not have a performance bond loss. For purposes of this Brief, SAA will assume that the payments were only pursuant to the payment bond.

**Statement of the Case**

CIC filed this suit alleging that the VA wrongfully disbursed $342,166 of contract funds. The Government denies that this Court has jurisdiction under the Tucker Act, 28 U.S.C. §1491, to hear any suit by a payment bond surety, including this suit by CIC, because a payment bond surety is subrogated to only the rights of the subcontractors and suppliers whom it paid, and they have no rights under the Tucker Act. For purposes of the Motion to Dismiss, the issue is not whether CIC will ultimately prove that the payment was wrongful. The issue framed by the Government's motion is whether this Court has jurisdiction to decide the merits of CIC's claim if CIC's payments were under its payment bond.

**Argument**

At page 3 of its Brief, the Government succinctly summarizes its argument as follows:

> A surety which paid subcontractors only under the payment bond obligation is subrogated only to the rights of the subcontractors. Such a surety is therefore not in privity with the United States and cannot bring a claim against the United States under the Tucker Act.

The Government's argument does not depend on the merits of this case or the details of the transactions between the VA, CIC and R&T. Instead, the Government seeks a holding that payment bond sureties in general, and therefore CIC in particular, cannot sue under the Tucker Act.

This Court, of course, is bound to follow precedent of the Court of Appeals for the Federal Circuit and the Court of Claims. Those Courts repeatedly held that the Tucker Act grants jurisdiction over a suit by a payment bond surety to recover contract funds that the

Government owes under the bonded contract or that the Government wrongfully paid in violation of the contract or after notice from the surety.

In *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973), ("*USF&G")* the court explained why a payment bond surety can sue the United States while unpaid subcontractors and suppliers cannot:

> The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the defendant.

(475 F.2d 1382).

*Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed. Cir. 1985) involved a payment bond surety seeking to recover contract funds wrongfully paid by the Government. The Court noted that although other theories were possible, the traditional means for the surety to assert its claim was equitable subrogation and then quoted the above language from *USF&G* in rejecting the Government's contention "that a surety is similar to a subcontractor, who is not in privity of contract with the Government." (775 F.2d 1160).

In *United Electric Corp. v. United States*, 227 Ct.Cl. 236, 647 F.2d 1082 (1981), the Court reiterated that subcontractors cannot sue the United States and explained the surety's standing to sue under the Tucker Act as follows:

> [W]hile the surety gains equitable rights from its subrogation to the subcontractors' claims, its standing to sue (its ability to enforce those rights and others) comes from the fact that it is also subrogated to, and stands in the shoes of, the contractor, an entity which is clearly in privity of contract with the Government.

*International Fidelity Insurance Company v. United States*, 41 Fed.Cl. 706, 711 (1998) stated:

> It is settled law that the Tucker Act, coupled with the doctrine of equitable subrogation, provides subject matter jurisdiction to the court to determine a surety's claim against the government stemming from the alleged improper disbursement of contract funds.

Other cases allowing payment bond sureties to sue for contract funds held, or wrongfully paid, by the United States include *Home Indemnity Co. v. United States*, 180 Ct. Cl. 173, 376 F.2d 890 (1967); *Great American Insurance Co. v. United States*, 203 Ct.Cl. 592, 492 F.2d 821 (1974); *Fireman's Fund Insurance Co. v. United States*, 190 Ct.Cl. 804, 421 F.2d 706 (1970); *Argonaut Insurance Co. v. United States*, 193 Ct. Cl. 483, 434 F.2d 1362 (1970); *Hartford Fire Insurance Co. v. United States*, 40 Fed. Cl. 520 (1998); *International Fidelity Insurance Co. v. United States*, 25 Cl. Ct. 469 (1992); *United Pacific Insurance Co. v. United States*, 16 Cl. Ct. 555 (1989); *United States Fidelity & Guaranty Co. v. United States*, 16 Cl.Ct. 541 (1989); *Reliance Insurance Co. v. United States*, 15 Cl.Ct. 62 (1988); and *Integon Indemnity Corp. v. United States*, 12 Cl.Ct. 115 (1987).

The Government argues, in effect, that the decisions discussed above, and the numerous similar cases allowing suit by a payment bond surety, were overruled, *sub silencio*, by *Dept. of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 119 S.Ct. 687, 142 L. Ed. 2d 718 (1999) and that *dicta* in *Insurance Company of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001) is now the controlling authority on the issue presented.

## I. *Blue Fox* is Consistent with Tucker Act Jurisdiction for Suit by a Payment Bond Surety

*Blue Fox* involved neither a surety nor the Tucker Act. The Court held that the Administrative Procedures Act ("APA"), at 5 U.S.C. §702, did not waive the Government's sovereign immunity for suit by an unpaid subcontractor. The APA waives sovereign immunity for suits other than for money damages. The Court reasoned that money damages included compensatory or substitute relief, and the unpaid subcontractor was seeking money to

compensate or substitute for the loss occasioned by the prime contractor's default. The Court stated:

> We accordingly hold that the sort of equitable lien sought by respondent here constitutes a claim for “money damages”; its goal is to seize or attach money in the hands of the Government as compensation for the loss resulting from the default of the prime contractor. As a form of substitute and not specific relief, respondent’s action to enforce an equitable lien falls outside of § 702’s waiver of sovereign immunity.

(525 U.S. 263, 119 S.Ct. 692).

*Blue Fox* recognized that "money damages," although excluded from the sovereign immunity waiver of the APA, are within the waiver of the Tucker Act. The Court stated, "Congress, of course, has waived its [the United States’] immunity for a wide range of suits, including those that seek traditional money damages. Examples are . . . the Tucker Act, 28 U.S.C. §1491." (525 U.S. 260, 119 S.Ct. 690). The result in *Blue Fox*, of course, is consistent with longstanding Federal Circuit and Court of Claims cases, such as *USF&G* and *United Electric*, supra., holding that subcontractors cannot sue under the Tucker Act.

It is important to remember that *Blue Fox* dealt with sovereign immunity not the merits of an equitable claim or any right to payment. While the Court held that the APA did not waive sovereign immunity for liens on Government funds to recoup losses, it did not question, and had no reason to question, that such liens existed and could be enforced if there were an applicable sovereign immunity waiver.

## II. The Insurance Company of the West Decisions Are Consistent With Tucker Act Jurisdiction Over Suits by a Payment Bond Surety

The Government took the position that *Blue Fox* meant sovereign immunity barred all Tucker Act suits by sureties other than sureties that had signed takeover agreements with the Government. The test case for this argument was a claim filed by Insurance Company of the

West ("ICW") to recover payments made to the contractor after ICW had requested, and the Government had agreed, that all future payments be mailed to ICW's address. ICW financed the contractor's completion of the work and had only a performance bond loss. There were several earlier cases granting judgment to the surety on almost identical facts, and the only real issue in the case was the effect of *Blue Fox*.

*Insurance Company of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001) rejected the Government's arguments and held that there was a sovereign immunity waiver and Tucker Act jurisdiction for ICW's suit. First, the Court noted that *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949) established that the Anti-Assignment Acts do not bar subrogation claims and that a subrogee, standing in the shoes of someone for whose claim sovereign immunity has been waived, has the benefit of the waiver unless the waiver was expressly limited to the original claimant. The Court held that the Tucker Act waiver was for claims, not claimants, and extended to a surety subrogated to the contractor's rights.

In *ICW* the Government also argued that under the doctrine of subrogation, the surety was subrogated only to the rights of the creditor it paid. In the context of a Miller Act performance bond, that creditor is the United States, and so the Government argued that the surety stood in the shoes of the United States, not those of the contractor. The Court rejected that argument based on *Balboa Insurance Co. v. United States*, supra., and *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). The Court in *ICW* stated:

> The government also argues that even if sovereign immunity does not bar ICW's claim, this court's precedents have misapplied the doctrine of subrogation. The government cites *Pearlman* for the proposition that "a surety who pays the debt of another is entitled to all the rights of the person he paid," *Pearlman*, 371 U.S. at 137, 83 S.Ct. 232, and it argues that a surety that completes performance of a government contract would therefore step into the shoes of the government,

> not the contractor. We disagree. A contractor essentially owes the government a debt of performance, and a surety who completes performance pays the debt. We believe that *Balboa* correctly states the law of equitable subrogation. *Pearlman* stands for the proposition that the subrogee steps into the shoes both of the contractor against the government and the government against the contractor.

(Footnote 3, 243 F.3d 1375).

The Court was clearly correct in its understanding of *Pearlman* and *Balboa*. Indeed, *Pearlman* concluded:

> We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.

(371 U.S. 141, 83 S.Ct. 237).

If the contractor had completed the work and paid its bills, it would have been entitled to the contract funds, and the surety that paid the bills is subrogated to the contractor's rights, as well as to the rights of the Government and the persons paid. *Balboa*, of course, says the same thing. In rejecting the Government's contention that the surety was in the same position as a subcontractor or supplier, the *Balboa* Court stated, "The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States." (775 F.2d 1161 quoting from *USF&G*, supra., 475 F.2d at 1382). For present purposes, it is crucial to note that both *Balboa* and *Pearlman* were payment bond cases. That is, the sureties' losses were only under their payment bonds. No performance bonds or performance bond losses were involved.

With that background, *ICW*'s *dicta* addressing the rights of payment bond sureties is clearly inconsistent with the Court's actual holding. The Court stated at 243 F.3d 1371:

> It is well-established that a surety who discharges a contractor's obligation to pay subcontractors is subrogated only to the rights of the subcontractor. Such a surety does not step into the shoes of the contractor and has no enforceable rights against the government.

This is *dicta* because there was no payment bond surety before the Court and no need to address the rights of a payment bond surety. The Court was demonstrably incorrect in terming its statement as "well-established." On the contrary, it conflicts with the numerous cases allowing payment bond sureties to sue the United States, with the very cases, *Balboa* and *Pearlman*, that the *ICW* Court later relied on to define the scope of the surety's subrogation rights, and with the holdings of *Balboa*, *USF&G* and other cases discussed above in which payment bond sureties were explicitly held to be subrogated to the rights of the contractor as well as to the rights of the subcontractors and suppliers.

The only authority cited by *ICW* in support of its statement was *United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). The only issue in *Munsey Trust* was the Government's right of setoff. Neither sovereign immunity nor standing to sue were at issue. Indeed, Munsey Trust Company was the receiver for the contractor and sued in the contractor's name, albeit for the benefit of the surety. The issue was whether the Government could setoff a debt owed by the contractor on another job against the contract funds the Government owed on the bonded jobs. The Court held that the right of setoff prevailed. In *Pearlman* the Court explicitly limited *Munsey Trust* to the setoff issue. *Pearlman* stated:

> The point at issue in that case [*Munsey Trust*] was whether the United States while holding a fund like the one in this case could offset against the contractor a claim bearing no relationship to the contractor's claim there at issue. We held that the Government could exercise the well-established common-law right of debtors to offset claims of their own against their creditors. This was all we held."

(371 U.S. 140, 83 S.Ct. 237)

If *Munsey Trust* is limited to setoff, it has no effect on the payment bond surety's ability to sue the United States. Nevertheless, it was in the context of reconciling *Pearlman* and *Munsey Trust* that the Court of Claims in *USF&G* and *United Electric* stated that the payment bond surety was subrogated to the rights of the contractor (and so could sue the United States) and to the equitable claims of the subcontractors and suppliers it paid (and so had a right to the contract funds superior to the contractor).

The Federal Circuit remanded ICW's case to the Court of Federal Claims, and the Government argued on remand that the Federal Circuit's statement on the subrogation rights of a payment bond surety nullified the authority cited by ICW and limited the scope of sureties' equitable subrogation claims. In a reported opinion, *Insurance Company of the West v. United States*, 55 Fed. Cl. 529, 534-538 (2003), Judge Miller discussed this contention in light of prior decisions and concluded, "Read against the foregoing precedent, the dicta in *West II* do not define the scope of a surety's rights under the doctrine of equitable subrogation." (55 Fed. Cl. 538).

On remand in *ICW*, the Government also argued: (1) that since the surety sued as subrogee of the contractor, it could not complain that payments were made to the contractor and (2) that the surety's claim was barred by the release the contractor gave in return for the wrongful payment. The Court rejected these arguments because once the Government became a stakeholder of contract funds it could not pay those funds to the wrong claimant and by doing so avoid liability to the right claimant. In its decision following remand in the ICW case, the Court held:

> Accordingly, defendant has not shown that the contract payments made to PCE [the contractor], or the release executed between the defendant and PCE, preclude plaintiff from asserting a claim over which this court has jurisdiction.

(55 Fed. Cl. 540).

## III. A Payment Bond Surety Can Enforce the Superior Equities of the Subcontractors It Paid

Although sovereign immunity bars unpaid subcontractors from suing the United States to enforce their equitable claim to the contract funds earned by their work, their equities still exist and are superior to any claim by the defaulting contractor. *Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), held:

> It [the surety] paid the laborers and materialmen, and thus released the contractor from his obligations to them, and to the same extent released the government from all equitable obligations to see that the laborers and supplymen were paid.

See also, *USF&G*, supra. ("The subcontractors do possess equitable rights to the retained funds vis-a-vis other claimants to the money"). (475 F.2d 1382).

When the surety pays the subcontractors, it is subrogated to their superior equities and can claim the contract balances in preference to the defaulting contractor or anyone claiming through the contractor. At least since *Henningsen*, payment bond sureties have been held to be entitled to contract funds. In *Pearlman*, *supra.*, the Court rejected an argument that *Munsey Trust* changed the equitable rights of a surety and stated:

> But the equitable rights of a surety declared in the Prairie Bank case as to sureties who complete performance of a contract were expressly recognized and approved in Munsey, and the Henningsen rule as to sureties who had not completed the contract but had paid laborers was not mentioned. Henningsen was not even cited in the Munsey opinion. We hold that Munsey left the rule in Prairie Bank and Henningsen undisturbed. We cannot say that such a firmly established rule was so casually overruled.

In *Blue Fox* the Court thought that *Prairie State Bank*, *Henningsen*, and *Pearlman* were not authority for a sovereign immunity waiver, but it did not question that they correctly stated the relative equities of the contesting claimants in the absence of a sovereign immunity bar.

Indeed, if sovereign immunity is waived, unpaid subcontractors can sue the Government for payment out of contract funds. Congress waived sovereign immunity for the United States Postal Service by authorizing it to sue and be sued, and *Kennedy Electric Co. Inc. v. United States Postal Service*, 508 F.2d 954 (10th Cir. 1974); *Active Fire Sprinkler Corp. v. United States Postal Service*, 811 F.2d 747 (2nd Cir. 1987); and *Wright v. United States Postal Service*, 29 F.3d 1426 (9th Cir. 1994) all allowed subcontractors to sue the Postal Service for contract funds.

The United States requires its construction contractors to pay the persons who furnish labor and material for use in performance of the contract. These persons can sue the contractor and its surety on the Miller Act payment bond, but the obligee of the bond is the United States. The contractor promises the United States that the subcontractors, suppliers and laborers will be paid. In addition to the promise in the payment bond, the clause for Payments under Fixed Price Construction Contracts required by FAR §52.232-5 (48 C.F.R. §52.232-5) forbids payment to a contractor unless the contractor certifies in its request for payment that:

> All payments due to subcontractors and suppliers from previous payments received under the contract have been made, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code.

This contract clause implements the certification provision of the Prompt Payment Act, 31 U.S.C. §3903(b)(1)(B). A contractor that falsely certifies payment to its subcontractors and suppliers violates the payments clause and is subject to termination for default. *Lamb Engineering & Construction Co. v. United States*, 58 Fed. Cl. 106 (2003).

Finally, the Government has the right to use contract funds to pay the subcontractors and suppliers directly if the contractor fails to pay them. Indeed, the courts have urged the Government to make such payments when that is the only way to get the funds to the

subcontractors and suppliers. *USF&G*, supra.; *Argonaut Insurance Co. v. United States*, supra.; *North Denver Bank v. United States*, 193 Ct. Cl. 225, 432 F.2d 466 (1970). In *Lamb Engineering & Construction Co. v. United States*, supra., the Court, citing *Pearlman*, agreed with the Government that it could make such payments ("As the defendant correctly points out, however, the government has the right to use retained funds to pay subcontractors.") (58 Fed.Cl. 113).

When the surety pays the subcontractors and suppliers, therefore, it satisfies the contractor's obligation to them, it satisfies the contractor's obligation to the Government, and it satisfies the Government's equitable duty to the subcontractors and suppliers. Thus, the Court in *Pearlman* held that the payment bond surety was subrogated to the right of the Government to use the contract fund to pay subcontractors, the right of the subcontractors to be paid out of the fund, and the right of the contractor to receive the contract fund once the subcontractors were paid and the work completed. (371 U.S. 141, 83 S.Ct. 237).

**IV. Logic and Public Policy Support Rejection of the Government's Arguments.**

The Government argues that the bond is to protect the Government not the surety, and that the surety received a premium to take the risk that the contractor would default. That premium, however, was based on loss experience, and those losses reflected the long-standing case law that allowed the surety to assure that contract funds were not dissipated. For decades, a Miller Act surety has been able to notify the Government that the contractor defaulted in payments to its subcontractors and suppliers, and the Government is then responsible for withholding the final contract payment. [1]

---

[1] If the work is physically complete, the duty to withhold is absolute. If the work is not complete, the contracting officer can consider the Government's interest in having the work completed along with the surety's interest in preserving the contract funds. *Balboa*, supra.

The surety takes the risk that the cost to complete the work and pay the persons who provided labor and material for use in performance of the contract will exceed the contract price. If the contract funds are being diverted, however, it can stop further payments to the contractor by giving the Government notice of the contractor's default. The surety does not assume the risk that the Government will erroneously pay the contractor after notice of the contractor's default. The surety does not take the risk of losses caused by the Government's mistakes. If this well established rule has changed, sureties are not charging enough for Miller Act bonds. Their historical loss experience assumes the ability to protect the contract funds, and premiums are based on that experience.

The implications of the Government's argument, however, go beyond the facts of this case. Here, the Government paid the wrong party. The Government's jurisdictional argument, however, would equally bar a payment bond surety from suing for contract funds still held by the Government. The Government could retain the work and the money appropriated to pay for it. The contractor could not sue for the remaining contract funds because it defaulted by not paying its subcontractors and suppliers. The subcontractors and suppliers could not sue because the United States has not waived sovereign immunity for such a suit. If the surety also could not sue, the Government could simply keep the money.

The Government seeks to upset a fair and reasonable allocation of rights and responsibilities developed by the Courts and in place for many years. The contractor is obligated to pay for the labor and material used on the project. If he does not, he loses his right to receive additional contract funds. The surety, by paying for the labor and material, becomes entitled to the contract funds. The Government, however, is protected because it incurs liability to the surety only if it (1) makes payment in violation of the contract, or (2) breaches its duty to

withhold the funds after the surety notifies it of the contractor's default and requests that the funds be held or paid to the surety.

**V. This Court Has Tucker Act Jurisdiction Over a Payment Bond Surety's Suit**

The issue presented by the Government's Motion to Dismiss is not whether CIC will ultimately prevail on the merits of its claim. To decide the Motion, the Court does not need to resolve any factual disputes over whether VA agreed to the modified payment terms by accepting the bonds or became a stakeholder or abused its discretion in making progress payments. Those are all issues relevant to the merits not to the jurisdictional issue before the Court.

The Government's Motion is very clear. It seeks a holding that a surety with only payment bond losses is subrogated to only the rights of the persons it paid and therefore cannot sue the United States under the Tucker Act. As discussed above, the Government's argument is incorrect and refuted by precedent binding on this Court. The Motion, therefore, must be denied and the case allowed to proceed to a determination of the merits of CIC's claim.

**Conclusion**

SAA respectfully suggests that this Court has Tucker Act jurisdiction over CIC's suit for contract funds wrongfully disbursed to R&T and the Motion to Dismiss should be denied.

Dated: July 29, 2005.

s/ Edward G. Gallagher
Edward G. Gallagher
Wickwire Gavin, P.C.
8100 Boone Blvd., Suite 700
Vienna, VA 22182
Tel: (703) 790-8750
Fax: (703) 448-1801

Attorney for Amicus Curiae
The Surety Association of America

CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2005, a copy of the foregoing Brief as Amicus Curiae was filed electronically. I understand that notice of this filing will be sent to counsel for all parties by the Court's electronic filing system. Parties may access a copy of this filing via the Court's electronic filing system.

s/Edward G. Gallagher
Edward G. Gallagher