# In the United States Court of Federal Claims

No. 04-1478C
(Filed: May 26, 2006)

```
* * * * * * * * * * * * * * * * * *    *
                                       *
CAPITOL INDEMNITY                      *
CORPORATION,                           *
                                       *
            Plaintiff,                 *   Equitable Subrogation; Payment Bond
                                       *   Surety; Notice of Contractor's Default
     v.                                *
                                       *
THE UNITED STATES,                     *
                                       *
            Defendant.                 *
                                       *
* * * * * * * * * * * * * * * * * *    *
```

*Irwin L. Kass,* Madison, MI, for plaintiff.

*Tara Kathleen Hogan,* U.S. Department of Justice, Washington, DC, with whom were *Peter D. Keisler, Assistant Attorney General* and *Director David M. Cohen,* for defendant.

*Edward Graham Gallagher*, Vienna, VA, for *Amicus Curiae* Surety Association of America.

**O P I N I O N**

**FIRESTONE**, *Judge*.

Pending before the court is a motion by the defendant, the United States ("government" or "United States"), to dismiss the complaint of the plaintiff, Capitol Indemnity Corporation ("plaintiff" or "Capitol Indemnity") for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Rules of the United

States Court of Federal Claims ("RCFC"). The government contends that the plaintiff, a Miller Act, 40 U.S.C. §§ 3131-3134 (2000 & Supp. 2002), surety of a government contractor who fulfilled its obligations only under a payment bond on a government construction contract, may not state a claim against the United States pursuant to the doctrine of equitable subrogation.[1] Because the plaintiff only paid subcontractors pursuant to its payment bond obligations, the government argues that the plaintiff's claim for reimbursement of its costs through the doctrine of equitable subrogation must be dismissed.[2] In the alternative, the government argues that even if the plaintiff may maintain a claim for equitable subrogation, the plaintiff's failure to notify the government of the prime contractor's default on its obligations to its subcontractors is fatal to its equitable subrogation claim as a matter of law. For the reasons that follow, the court finds that a payment bond surety may maintain a claim for equitable subrogation, but that

---

[1] In general, that doctrine provides that a surety who provides a bond guaranteeing the performance of a contract and who performs its obligations under that bond following contractor default may step into the shoes of another and assert that person's rights in seeking reimbursement of its costs. The government does not dispute that if the plaintiff had been called upon to take over and complete performance of the contract at issue pursuant to its performance bond obligations, then the plaintiff would be subrogated to the rights of the prime contractor. As a result, a performance bond surety would be able to step into the contractor's privity of contract with the government, and therefore would be able to rely on the waiver of sovereign immunity contained in the Tucker Act, 28 U.S.C. § 1491 (2000), to sue the United States for payment.

[2] The government contends that because the plaintiff merely paid subcontractors pursuant to its payment bond obligations, the plaintiff is only subrogated to the rights of those subcontractors, who are not in privity of contract with the government and who therefore cannot sue the United States under the Tucker Act. Because the plaintiff is not in privity of contract with the government either, the government contends that the plaintiff may not sue the United States in this court.

the plaintiff's equitable subrogation claim must be dismissed on the merits. The government's motion to dismiss this claim is therefore **GRANTED**.

## BACKGROUND

The following facts are taken from the plaintiff's complaint and are presumed to be true for purposes of the government's motion to dismiss. On or about September 26, 2002, the Department of Veterans Affairs ("VA") awarded Contract Number V69DC-506-8a to replace ARF chillers at the VA Medical Center in Milwaukee, Wisconsin, to R&T Mechanical Contractors, Inc. ("R&T") for $579,257. R&T was required by the Miller Act, 40 U.S.C. §§ 3131-3134, to obtain performance and payment bonds from a surety in order to secure R&T's performance of the contract. On November 22, 2002, the plaintiff, as surety for R&T, issued performance and payment bonds which contained the following condition: "All contract funds relating to this project are to be sent to Northern Escrow, Inc. for distribution." Compl. ¶ 6. The plaintiff had hired Northern Escrow, Inc. ("Northern") to administer the contract by receiving progress payments from the United States and distributing the funds in accordance with the contract. The plaintiff, with R&T's assent, included this payment provision in the bonds due to its concerns about R&T's ability to satisfy its obligations to its subcontractors, suppliers, and materialmen. The bonds were accepted by the United States.

On December 5, 2002, the United States received R&T's first progress report and progress payment application. The progress report stated that R&T had completed only

5% of the work required by the contract, although scheduled completion was 24%. Notwithstanding this discrepancy, the United States authorized a progress payment of $28,460 and paid this amount directly to R&T, rather than to Northern. The United States did not obtain the plaintiff's consent to pay R&T directly.

On December 24, 2002, the United States received R&T's second progress report and progress payment application. The progress report stated that 12% of the contract was complete, while the payment application stated that 52% of the contract was complete. Scheduled completion was 35%. Notwithstanding this additional discrepancy, the United States again authorized a payment, this time in the amount of $274,674, and again sent this payment directly to R&T, rather than to Northern, without the plaintiff's consent.

On February 5, 2003, the United States received R&T's third progress report and progress payment application. This time both the progress report and the payment application indicated that the contract was only 19% complete, although scheduled completion was 58%. The United States again authorized payment, in the amount of $38,942.00, and sent this payment directly to R&T, rather than Northern, without the plaintiff's consent.

The first three progress payments totaled $342,166.00, representing 60% of the contract price. Following these three payments, the United States sent the remaining five

progress payments to Northern, rather than to R&T.³  However, R&T failed to properly pay its subcontractors, suppliers, and materialmen, and therefore defaulted on the contract with the United States.  The subcontractors, suppliers, and materialmen filed claims against the bonds, and thus far the plaintiff has been required to pay $113,556.00 to these parties.  The plaintiff demanded that the United States reimburse it in the amount of $113,556.00, discharge the plaintiff from any further bond obligations totally or pro tanto, and hold the plaintiff harmless from any pending unpaid claims.  The United States rejected the demand.

On September 20, 2004, the plaintiff filed its complaint in this court seeking reimbursement of the $113,556.00 it has paid to subcontractors, pro tanto discharge, to be held harmless from any pending unpaid claims, attorney's fees, interest, and costs.  One of the plaintiff's arguments is that it is entitled to reimbursement from the United States pursuant to the doctrine of equitable subrogation.  Under this doctrine, the plaintiff argues that, as a surety, it is entitled to be subrogated to the rights of R&T and any subcontractors it paid in any contract funds held as security by the United States.  The

---

³ Although it was not alleged in the complaint itself, apparently R&T executed an assignment instrument assigning R&T's right to be paid to Northern on November 26, 2002.  Pl.'s App. 12.  However, due to drafting errors, the instrument did not qualify as an assignment under the Assignment of Claims Act, 41 U.S.C. § 15 (2000).  After suggesting changes which were then inserted into another assignment instrument, the government finally acknowledged the assignment of R&T's right to be paid to Northern as qualifying as an assignment under the Assignment of Claims Act on February 20, 2003.  Pl.'s App. 21-22.  The complaint does not allege that there was a valid assignment of R&T's payment right at the time that the first three progress payments were made.

plaintiff argues that the United States abused its discretion by disbursing those contract funds directly to R&T rather than to Northern for the first three progress payments, and that therefore it is entitled to reimbursement from the United States for the amounts it has paid to subcontractors.

On June 3, 2005, the government moved to dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted. The government argues that because the plaintiff only fulfilled the obligations of its payment bond, the plaintiff is only subrogated to the rights of the subcontractors whom it paid. Because subcontractors do not have standing to bring claims against the United States, the government argues that the plaintiff may not bring its claim against the United States here. The government also argues that the plaintiff is not entitled to be reimbursed based on allegedly wrongful disbursements of progress payments because the plaintiff does not allege that it notified the government of R&T's default before the government made the first three progress payments. On July 29, 2005, the SAA filed its amicus brief arguing that a payment bond surety is subrogated to the rights of both subcontractors and the prime contractor. Oral argument was held on April 28, 2006.[4]

---

[4] Oral argument in this case was consolidated with the argument in two companion cases, <u>Commercial Casualty Insurance Co. of Georgia v. United States</u>, No. 03-2033C, and <u>Cincinnati Insurance Co. v. United States</u>, No. 05-751C. The government presented a single argument regarding privity and jurisdiction and therefore the resolution of that issue is the same for all three cases.

## DISCUSSION

**A.     Standard for Decision**

The government has filed a motion to dismiss for failure to state a claim.  "[I]t is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

**B.     Payment Bond Sureties May Rely upon the Privity of Contract  Between the United States and the Prime Contractor to Sue the United States**

In Commercial Casualty Insurance Co. of Georgia v. United States, No. 03-2033, this court has issued an opinion this same day addressing the government's argument that payment bond sureties may not maintain claims for reimbursement in this court.  This court held that a payment bond surety steps into the shoes of the prime contractor and asserts the prime contractor's contract claim, and that therefore a payment bond surety may maintain a suit against the United States for retained contract funds still in the government's possession.  The court will not repeat the analysis here.  Instead, the court attaches its opinion in Commercial Casualty as Appendix A and adopts that reasoning.

In this case, the government no longer possesses retained contract funds because it made disbursements to the prime contractor and to Northern, and thus this case presents

slightly different facts than Commercial Casualty. However, as noted in footnote 10 of that opinion, the plaintiff may still maintain a suit against the government for reimbursement of its costs:

> Nor is the result any different if the government no longer possesses a retained fund because the government improperly disbursed payment to the contractor after the surety notified the government that the contractor was in default. At the time the surety notifies the government of a contractor default, under the law of the Federal Circuit the government is a mere stakeholder in the remaining contract funds. See [Balboa Insurance Co. v. United States, 775 F.2d 1158, 1162 (Ct. Cl. 1985)] ("[U]pon notification by the surety of unsatisfied claims of the materialmen, the Government became a stakeholder with respect to the amount not yet expended under the contract that it holds at the time of notification of default."). Because the government is a mere stakeholder, its subsequent payment to the contractor cannot alone satisfy or release the contractor's claim. Someone other than the contractor may be entitled to assert the claim, and therefore an adjudication of the parties' rights is needed. See Ins. Co. of the West v. United States, 55 Fed. Cl. 529, 540 (2003) ("The Government cannot forward the theory that it has discharged its duty under the contract, thereby depriving the Court of Federal Claims of jurisdiction, when it has . . . perform[ed] acts which render it a stakeholder."). Therefore, even when the surety seeks recovery for a wrongfully disbursed progress payment, it is capable of asserting the contractor's claim to the contract funds.

Commercial Casualty, slip op. at 18 n.10. Moreover, the government does not directly argue that the fact that the government no longer holds the contract funds is a bar to the plaintiff's suit for reimbursement of its costs of performing its payment bond obligations. Therefore, the court holds that the plaintiff, like the plaintiff in Commercial Casualty, may maintain this action for reimbursement from the United States.

**C.     The Plaintiff Has Failed to State a Claim for Equitable Subrogation Because it Does Not Allege that it Notified the Government of R&T's Default Prior to Disbursement of the First Three Progress Payments**

The government argues that even if the plaintiff may maintain a claim for equitable subrogation, the plaintiff has failed to state such a claim because the plaintiff did not notify the United States of R&T's default or threatened default on the contract before the United States made the first three progress payments.  The government contends that it has no duty to a surety to use discretion and consider a surety's interests in disbursing progress payments until the surety notifies the government that it believes the contractor is in default.  The plaintiff argues that the clause in the bonds directing that payments be made to Northern was sufficient notice of R&T's possible default, and therefore the government was obligated to make payments to Northern rather than to R&T.  The plaintiff further argues that the discrepancies in R&T's progress reports were sufficient to put the government on notice of R&T's possible default and to trigger a duty to consider the plaintiff's interests in disbursing progress payments.

The court agrees with the government that the plaintiff has failed to state a claim for equitable subrogation in this case.  In order to assert the doctrine of equitable subrogation to hold the government liable for reimbursement based on improper disbursement of earned progress payments that are within the discretion of the contracting officer, a payment bond surety must notify the government that the contractor is or is

close to being in default.⁵  Ordinarily a surety asserts the doctrine of equitable subrogation to acquire retained contract funds that are still in the government's possession after performance of the contract is complete.  See, e.g., Prairie State Nat'l Bank of Chicago v. United States, 164 U.S. 227 (1896).  However, the doctrine has been expanded by the Court of Claims and Court of Appeals for the Federal Circuit to allow a surety to recover from the government when the government abuses its discretion in disbursing earned progress payments.

> When a contractor defaults under the contract, the obligation of the surety then arises under its performance and payment bonds. . . . [U]pon notification by the surety of the unsatisfied claims of the materialmen, the Government bec[omes] a stakeholder with respect to the amount not yet expended under the contract that it holds at the time of notification of default.

Balboa Ins. Co. v. United States, 775 F.2d 1158, 1161-62 (Ct. Cl. 1985).  Once the surety notifies the government of default and the government becomes a mere stakeholder in the remaining contract balance, the government is charged "with a duty of acting with reasoned discretion," id. at 1162, in disbursing further progress payments by "tak[ing] reasonable steps to determine for itself that the contractor ha[s] the capacity and intention to complete the job."  Id. at 1164.  Other than this duty, the "procurement officials [have] broad discretion and flexibility" because "during performance [the government] has a vital interest in the 'timely and efficient' completion of the work."  Id. (citation omitted).

---

⁵ For purposes of the government's motion to dismiss the plaintiff's equitable subrogation claim, it is assumed that the progress payments at issue were within the discretion of the contracting officer, and that the prime contract did not require that payments be withheld from R&T.

Therefore, "[t]he standard of proof to be applied in a case where an arbitrary and capricious disregard of the surety's interests, and an abuse of discretion, are charged must be, and is, high." Argonaut Ins. Co. v. United States, 434 F.2d 1362, 1368 (Ct. Cl. 1970).

In Ransom v. United States, 900 F.2d 242 (Fed. Cir. 1990), the Court of Appeals for the Federal Circuit further clarified Balboa by stating that the contractor's default alone is not sufficient to trigger a government obligation to consider the surety's interests or to withhold progress payments from the contractor. Ransom makes clear that the surety must explicitly notify the government of the default or threatened default. In that case, prior to terminating the contract, the government notified the surety that the government was concerned that the contractor might default. Id. at 243. The Federal Circuit stated:

> In Balboa, this court merely held that the government becomes a "stakeholder" for remaining contract proceeds when a payment and performance bond surety notifies the government that the surety's interest is in jeopardy because of default by the contractor. This holding was based upon the reasoning that once the surety notified the government of the contractor's default, the surety could assert the equitable doctrine of subrogation. No such notice by the surety is alleged here.

Ransom, 900 F.2d at 245 (citations omitted).

The government's equitable duty to use discretion in disbursing progress payments following notification of default is distinct from the government's duty not to impair the surety's interests by altering the terms of the contract or impairing the collateral that secures the contractor's performance. "Apart from the pro tanto discharge rule, which . . .

we find no occasion to peruse today [because the government did not depart from the terms of the contract] the government as obligee owes no equitable duty to a surety like Fireman's Fund unless the surety notifies the government that the principal has defaulted under the bond. . . . [N]otice by the surety is essential before any governmental duty exists."[6] Fireman's Fund Ins. Co. v. United States, 909 F.2d 495, 498 (Fed. Cir. 1990). Thus, if the disbursement of progress payments is within the discretion of the contracting officer under the terms of the contract, then the contracting officer owes no duty to the surety with regard to the payments until the surety notifies the contracting officer of the contractor's default.

Here, the plaintiff had not explicitly notified the government of any default by R&T at the time that the government made the first three progress payments. Although the plaintiff included a clause in the bonds directing that payments be made to Northern rather than to R&T, this cannot be considered a "notification" of threatened default. Because the clause was inserted in the bonds before performance of the contract had even

---

[6] Under the pro tanto discharge rule in suretyship law, if an obligee (here, the government) breaches or alters any specific contractual provision so as to materially alter the risk to the surety, or if the obligee impairs the collateral securing the contractor's obligations, then the surety's obligations under its bond are discharged. Moreover, if the surety performs its obligations either before such impairment or without knowledge of such impairment, then the surety may have a claim against the obligee for its losses. See Restatement (Third) of Suretyship & Guaranty § 37 (1996). Notification of default is not a prerequisite for a discharge claim. See Nat'l Sur. Corp. v. United States, 118 F.3d 1542, 1547 (Fed. Cir. 1997). The discussion of the notification issue above is therefore related only to the plaintiff's claim for the breach of an equitable duty to use reasoned discretion in disbursing discretionary progress payments, as described in Balboa.

begun, R&T could not have been in default on its performance of the contract. The plaintiff would not have been able to assert equitable subrogation in the contract funds before performance of the contract began. Therefore, to the extent the bond clause could be considered a "notification," it is not sufficient notice to trigger the government's duty to act with reasoned discretion in disbursing progress payments under Balboa.

In addition, the plaintiff's argument that the government was sufficiently on "notice" of R&T's potential default due to the content of its progress reports is unsupported. In Ransom, the Federal Circuit established that the government's equitable duty to consider the surety's interests is not triggered absent explicit notice either directly or indirectly from the surety. 900 F.2d at 245. Until the surety undertakes to protect itself by notifying the government of default and requesting that progress payments be withheld, the government is under no duty, apart from the pro tanto discharge rule, to protect the surety's interests. Fireman's Fund, 909 F.2d at 498.

It is for this reason that the plaintiff's reliance on Insurance Co. of the West v. United States, 55 Fed. Cl. 529 (2003), International Fidelity Insurance Co. v. United States, 41 Fed. Cl. 706 (1998), and Transamerica Premier Insurance Co. v. United States, 32 Fed. Cl. 308 (1994) is misplaced. In all three of those decisions, the surety, either itself or through the contractor, had explicitly notified the government of the contractor's default and had requested that payments be made to the surety. See 55 Fed. Cl. at 538-39; 41 Fed. Cl. at 713; 32 Fed. Cl. at 310. Moreover, in all three cases a contract

modification had been executed reflecting the government's obligation to pay the surety. 55 Fed. Cl. at 539; 41 Fed. Cl. at 713; 32 Fed. Cl. at 311.  Here, the plaintiff alleges neither an explicit notification of default, which would impose an equitable duty on the government, nor an explicit contract modification obligating the government to pay the plaintiff rather than R&T.  Accordingly, because the plaintiff has not alleged that it explicitly notified the government of R&T's default before the allegedly improper disbursements of progress payments were made, it has failed to state a claim for equitable subrogation.  The government's motion to dismiss this claim must therefore be **GRANTED**.

## CONCLUSION

For the foregoing reasons, the government's motion to dismiss is **GRANTED** as to the plaintiff's equitable subrogation claim.[7]  The court will contact the parties to establish a schedule for resolution of the plaintiff's pro tanto discharge claim.

**IT IS SO ORDERED.**

                s/Nancy B. Firestone
                NANCY B. FIRESTONE
                Judge

---

[7] The government also argued that the plaintiff could not assert an equitable subrogation claim because the government does not become a mere stakeholder in the retained contract funds, and therefore owes no duty to the surety, until performance of the contract is complete.  Because the court grants the government's motion to dismiss based on the plaintiff's failure to notify the government of R&T's default prior to the disbursement of the progress payments, the court does not reach the issue of whether performance must be complete.

 The government did not move to dismiss the plaintiff's pro tanto discharge claim, and therefore the court does not reach that claim in this opinion.